**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles Paul Hickman VERNA,
Defendant–Appellant.**

No. 95–5856.

United States Court of Appeals,
Fourth Circuit.

Argued April 11, 1997.

Decided May 14, 1997.

---

**ARGUED:** Susan Kay Seahorn, Assistant Federal Public Defender, Raleigh, NC, for Appellant.  John Samuel Bowler, Assistant United States Attorney, Raleigh, NC, for Appellee.  **ON BRIEF:** Janice McKenzie

Cole, United States Attorney, Raleigh, NC, for Appellee.

Before HAMILTON, LUTTIG, and WILLIAMS, Circuit Judges.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judges HAMILTON and WILLIAMS joined.

## OPINION

LUTTIG, Circuit Judge:

Appellant Charles Verna appeals from his convictions for possession of a firearm by a convicted felon, 18 U.S.C. § 922(g), and possession of a firearm not registered in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5861(d), arising out of his construction of a home-made bomb which he placed in the automobile of his former wife and two children. We affirm.

## I.

At approximately 8:00 a.m. on January 3, 1995, Patricia Ann Verna, appellant's former wife, was getting ready to take her two children, seven-year-old Victor and nine-year-old Nicole Lee, to school, and herself to work, per her usual schedule. When Patricia got to her car, Victor was holding a small package which he had found in the back seat of the car and which he believed to be a gift. J.A. at 47. Patricia and the children got in the car and left to go to school and to work. On the way to the school, Victor held the package up to his mother, opened it, and proceeded to shake and turn it. J.A. at 50–53. Patricia looked down into the package and noticed that it contained a bottle, wires, pennies, some broken glass, and leaves, J.A. at 48, 54–55, but she did not think much about it. J.A. at 54. After dropping Victor and Nicole off at school, Patricia went to work, where she showed the package to several of her co-workers, J.A. at 62, and, later that night, to her babysitter Lee Alderman, J.A. at 64–65. Alderman, believing the package to be a bomb, suggested that Patricia call the police, which she did. J.A. at 65. Soon thereafter, the police arrived on the scene with a bomb squad. J.A. at 65–66.

The police discovered that the package was, in fact, a bomb, as Alderman had suspected. The bomb comprised a glass tequila bottle filled with Pyrodex brand gun-powder and with several quartered pennies glued onto the outside of it, a plastic tool box, an ignitor, some wires, a broken light bulb, a model rocket ignitor, and four nine-volt batteries. J.A. at 163, 167–68, 178. The batteries were wired to the broken light bulb and model rocket ignitor, which were in turn buried in the gun-powder inside the bottle; this entire mechanism was inside the tool box. The bomb was designed to explode upon the opening of the tool box. Opening the tool box would complete an electric circuit and send an electric current from the batteries to the light bulb and model rocket launcher, which would then ignite the gun-powder, thereby causing the bottle to explode. J.A. at 163–68. Fortunately for Patricia and her children, the bomb did not detonate because Verna had used two ignitors—the light bulb and the model rocket ignitor—instead of one, mistakenly thinking that the use of two would ensure detonation. In fact, when the charge generated from the batteries was split between the light bulb and the model rocket ignitor, the charge was insufficient to activate either ignitor. Had Verna used only one of the ignitors, the bomb would have detonated when Victor opened the tool box. J.A. at 166–68.

Police investigators discovered significant evidence linking Verna to the bomb. For example, the police discovered Verna's fingerprint inside of the tool box, under the tequila bottle, and in a location that would have been accessible only after the molded interior of the tool box had been removed. J.A. at 208, 216–17. Additionally, when the police searched Verna's apartment, they found a string of Christmas tree lights similar to the type used in the bomb, with several bulbs missing, J.A. at 108, 196–97, a tube of super-glue similar to that used to make the bomb, J.A. at 108, 196, and a Radio Shack multi-meter circuit tester, J.A. at 110.

Verna was subsequently arrested and indicted for the possession of a firearm by a

convicted felon, 18 U.S.C. § 922(g),[1] and 'the possession of a firearm not registered to him in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5861(d).[2] J.A. at 12. A jury convicted Verna on both counts, and he was sentenced to 120 months imprisonment on each count, the sentences to run concurrently. J.A. at 460–61. From these convictions, Verna appeals.

## II.

■ Verna first argues that his conviction under section 922(g) must be reversed because there was insufficient evidence from which a reasonable jury could conclude that he possessed or received a firearm that had the requisite connection to interstate commerce. We disagree.

Section 922(g) makes it unlawful for a convicted felon, like Verna,

> to ... possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g). The term "firearm" includes "any destructive device," 18 U.S.C. § 921(a)(3)(D), which, in turn, is defined as

> any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled.

18 U.S.C. § 921(a)(4)(C). Thus, if there was sufficient evidence from which a reasonable juror could conclude *either* that Verna possessed "in or affecting commerce" an assembled bomb or a combination of parts from which a bomb could readily be assembled, or that he received an assembled bomb (or the requisite combination of parts) which had been "shipped or transported in interstate

... commerce," then Verna's conviction under section 922(g) must be sustained.

■ We are satisfied that the evidence in this case would support both findings. While there was no evidence that Verna possessed his bomb "in" interstate commerce, we believe that the evidence that Verna possessed and placed the bomb in an automobile, which travels the highways of North Carolina if not the federal highway system itself, is sufficient to fulfill section 922(g)'s requirement that Verna have possessed the bomb "affecting" interstate commerce. The potential, if not actual, effect on interstate commerce of a bomb in a vehicle traveling on a state highway which connects directly or indirectly with the interstate highway system is more than sufficient to meet section 922(g)'s "affecting commerce" requirement.

■ We are likewise satisfied that the evidence is sufficient to establish that Verna received a firearm which had been shipped or transported in interstate commerce. Verna's counsel conceded at argument that Verna possessed the component parts from which a bomb could readily be made (*i.e.*, a firearm). Additionally, Verna stipulated that the single most important component of the firearm— the Pyrodex gunpowder which served as the explosive in the bomb—traveled in interstate commerce, *see* J.A. at 27 (stipulation that the gun-powder "was manufactured in Herrington, Kansas, and travelled in interstate commerce across state lines to reach [him in] Wake County, North Carolina"). Verna also does not appear to contest, and the jury could reasonably have inferred, that the tequila bottle, which served as the vessel for the explosive, and the quartered pennies, which served as the fragmenting instrumentalities, also traveled in interstate commerce. Indeed, Verna does not even argue that these parts originated within the borders of North Carolina. Similarly, there appears to be no dispute that at least one of the two

---

**1.** Verna stipulated that he was a convicted felon within the meaning of section 922(g). J.A. at 27.

In addition, Verna, at oral argument, dropped his claim that section 922(g) was unconstitutional, in light of our decision in *United States v. Wells*, 98 F.3d 808 (4th Cir.1996).

**2.** Verna was also indicted for the attempted use of a destructive device against a person in the United States, 18 U.S.C. § 2332a(a)(2). This charge, however, was dismissed by the district court under the authority of *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Inexplicably, Verna was not charged under state law.

ignitors—the model rocket ignitor—was manufactured out of state.

■ At least where, as here, the principal parts of a combination of parts from which a destructive device concededly can be assembled have moved in interstate commerce, then the "combination" of parts is one which has traveled in interstate commerce and the interstate travel element of section 922(g) is met. It is simply not necessary, in order to satisfy the statute, that each and every individual part of the bomb itself have traveled across state lines, much less, as Verna argues, *see* Appellant's Br. at 18–19, that each and every component part have traveled across state lines *together.* Obviously, for example, a combination of parts from which a bomb can readily be assembled, each individual part of which has moved in interstate commerce, is a "firearm" "which has been shipped or transported in interstate . . . commerce."

### III.

■ Verna also argues that the district court abused its discretion in admitting into evidence a videotape which depicted the detonation of a laboratory-constructed bomb almost identical to the one constructed by Verna. Verna contends first, that the video was not relevant at all and, second that, if the video was relevant, it was nonetheless inadmissible because of the differences between his bomb and the bomb detonated in the video. We disagree that the district court erred in admitting the videotape.

The premise of Verna's argument that the videotape was irrelevant is that, under our precedent, even a dysfunctional bomb is a destructive device; therefore, Verna argues, it was irrelevant whether his bomb was in fact capable of detonation and destruction. The premise of Verna's argument, however, is incorrect. It is not clearly established in this Circuit that a dysfunctional bomb is always a destructive device (as opposed to a "deadly or dangerous weapon," *see, e.g.,* 18 U.S.C. § 111(b); *id.* at § 2113(d)). Indeed, in *United States v. Hamrick,* 43 F.3d 877, 884 (4th Cir.1995) (en banc), this court divided equally over the question of whether the dysfunctional bomb built by Hamrick was a

destructive device under *inter alia* 18 U.S.C. § 924 and 26 U.S.C. § 5861. The video therefore was directly relevant to the essential element of whether Verna's bomb was, and was intended to be, a destructive device. Indeed, because the bomb at issue in this case never actually detonated, the video was especially relevant on the question of whether the device had destructive capability.

■ Verna's alternative argument as to the inadmissibility of the videotape is likewise meritless. As the government's expert witness testified, the experimental bomb was virtually identical to the bomb constructed by Verna:

> The same bottle was used. The igniters were constructed in the same way. The igniters were placed in the bottle in the same way. The length of the wires were placed there in the same way. The bottle was closed the same way. The explosive charge in this bomb was reconstructed in the identical same way. . . . [And] [w]e weighed the [gun-]powder and put the same amount of powder in it. The explosive charge was identical to the charge that was in the bottle.

J.A. at 178. The only differences between the bomb constructed by Verna and that detonated in the videotape were those required to protect the safety of the experimenters, and to insure that, unlike the actual bomb, the experimental bomb would detonate. Thus, an external power source was used to permit detonation of the bomb from a remote location, and a more powerful source of power was used to insure detonation. J.A. at 176–77. Even as to these differences, the district court instructed the jury in detail that the duplicate bomb had not been detonated "by using the four batteries and the electrical components or energy source from the [actual] bomb[,] . . . [but] a car battery, and how that causes it to be comparable or doesn't cause it to be comparable, I will leave for you to judge as the jury and to weigh accordingly," J.A. at 181. There was therefore little, if any, chance that the jury was misled by the videoed bomb detonation.

## IV.

 Finally, Verna argues that certain conduct by the prosecutor during trial violated his constitutional rights to counsel and a fair trial. Although Verna points to several alleged incidents of prosecutorial misconduct, only one of these incidents warrants mention and it does not come close to necessitating a reversal of Verna's conviction.

During closing arguments, apparently in response to Verna's defense that Patricia Verna had actually constructed the bomb in order to "frame" her ex-husband, the prosecutor implied that Verna's attorney had "coached" several of Verna's witnesses. *See* J.A. at 364, 366–67. Specifically, the prosecutor stated that Verna had "paraded into this courtroom today with three obviously well-coached witnesses who wanted you to believe that [Patricia Verna was] a liar," J.A. at 366, and that one of these witnesses in particular had "decided to come in here and say what had been carefully inculpated to her by Mr. Verna's lawyer," J.A. at 366. These comments immediately brought down the ire of the district court judge who, in the course of sustaining Verna's objections to the comments, instructed the jury to disregard the comments and sternly admonished the prosecutor for making the comments:

> That is totally impermissible argument. Disregard that. Don't you argue that again. I mean, what you are saying is that the lawyers have somehow concocted or contrived testimony, and there isn't any evidence or representation of that whatsoever.... [T]hat is grossly impermissible argument.

J.A. at 366–67.

Although the prosecutor's arguments were improper, they do not, under the circumstances here presented, rise to the level that would require reversal. First, the court's admonition of the prosecutor and its instruction to the jury to disregard the prosecutor's comments eliminated any possibility that the jury would have been mislead or prejudiced by the comments. Second, the prosecutor's statements were isolated remarks, occurring only at the one point during the prosecutor's argument. Third, the evidence linking Verna to the bomb, *i.e.*, the physical evidence described *supra* as well as the circumstantial evidence of his relationship with Patricia Verna, was powerful. And, finally, the prosecutor's immediate apology to the court, *see* J.A. at 367 ("I apologize if that is what you [took my comments to mean]. I can assure you that is not what [was] intended."), reflect that his comments were not deliberately made to the jury in order to divert their attention to non-relevant matters. *See generally United States v. Harrison,* 716 F.2d 1050, 1052 (4th Cir.1983).

For the reasons stated, the judgment of the district court is affirmed.

*AFFIRMED.*