**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
No. 96-11121

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    VERSUS

ROGER EUGENE GRESHAM,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____
July 16, 1997

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:


    Roger Gresham challenges his convictions of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d).  Finding no error, we affirm.


I.

    Gresham and Cheryl Taylor lived together for many years, but their relationship ended in 1995.  Following their separation, Gresham resolved to build a bomb and take revenge on Taylor.  He

carelessly discussed his plans, however, leaving an incriminating trail. At trial, witnesses recounted the evolution of Gresham's plot in damning detail.

A.

Gresham and Taylor were living together in Kensett, Arkansas, prior to their separation. As their relationship began to erode, Gresham regularly complained to the Kensett police chief, Ralph Jordan, that Taylor was stealing his property while Gresham, a truck driver, was absent on his routes. In one conversation, Jordan testified that Gresham threatened to kill Taylor. Finally, in September 1995, Taylor left Gresham and moved into a mobile home behind her parents' home, an apartment above an old gas station in Alvord, Texas.

In October 1995, Gresham offered a ride to a hitchhiker, Jimmy Saville, and offered to hire him to torch a mobile home in Alvord. Saville described the location of the mobile home, which was located behind an old store with an upstairs residence. This description precisely matched the address of Taylor's home. Saville declined the offer and reported the suspicious situation to the Wise County sheriff's department.

During the course of the next month, Gresham spoke often with Anthony Odell, an employee of the Alvord Citgo Truck Stop. Gresham claimed he was heartbroken over his separation from Taylor and inquired whether Odell would burn down a residence in Alvord. Odell identified the residence as Taylor's parents' home.

Furthermore, Gresham offered Odell $250 to deliver a package to the mobile home located behind the residence. In response to a query from Odell, Gresham explained that the package contained a bomb. Odell declined the offer.

During this same period, Gresham was living in Odessa, Texas, with his aunt, Dorothy Underwood, who testified that Gresham had expressed his desire to take revenge on Taylor for leaving him. Furthermore, Underwood testified that in November 1995, Gresham built a pipe bomb in her home using gunpowder and component parts purchased at Wal-Mart. When she confronted Gresham about the bomb, he explained that he intended to bomb Taylor's parents' home. Underwood protested this plan, and Gresham moved out of her house. On December 31, 1995, Gresham called Underwood and warned her not to discuss his activities while living with her, explaining that he was about to take his revenge on Taylor.

On the same day Gresham was building the pipe bomb in Odessa, the post office in Seminole, Texas, received a change of address order for "Cheryl Presley," redirecting her mail from an address in Seminole to an address in Odessa. "Cheryl Presley" was a pseudonym occasionally used by Cheryl Taylor, and the address in Seminole belonged to her mother. Subsequently, Gresham confessed to Underwood that he had redirected Taylor's mail from an address in Seminole to a vacant house in Odessa, verifying his claim by showing Underwood a letter addressed to Cheryl Taylor.

Later that month, Gresham's son, Roger, learned that his father had built a pipe bomb, and observed its detonation. Roger

3

subsequently guided investigators to the site of the blast, where they discovered the charred remnants of an explosive device. Based on their observations and an analysis of the component parts, investigators concluded that a pipe bomb had exploded in the area.

On December 8, 1995, Gresham attempted to hire a mechanic, Robert Markle, to deliver a package to his ex-girlfriend's house. Gresham bragged to Markle about his experience in such matters, stating that he had "done this before." Markle declined the offer.

Finally, by January 1996, Gresham's plot had reached fruition. While attending an orientation for Southern Refrigerated Transport, his new employer, Gresham confided in another driver, Michael Long. Gresham stated that he and his girlfriend had recently separated, and expressed his desire to take revenge against her. Furthermore, Gresham recounted his plan to Long in excruciating detail.

Gresham told Long he was going to mail his girlfriend a bomb, using a United Parcel Service ("UPS") label that had been prepared by another individual. To persuade her to open the package, Gresham explained that he had redirected his girlfriend's mail and intercepted a Christmas card addressed to her from a friend, which he intended to package with the bomb like a Christmas present. Long did not observe the card, but he did see a white envelope addressed to Taylor. Finally, Gresham showed Long the bomb, a section of pipe with capped ends. Gresham recanted the next day, explaining that he had decided not to send the bomb, but he threatened to harm Long and his family if Long repeated their conversation.

4

Later in January, Gresham asked Roger to deliver a brown cardboard box to Taylor, along with a photograph that he had intercepted from Taylor's mail. Gresham explained his plan to package Taylor's mail with the box, to persuade her to open it. In addition, Gresham boasted that he could alter the entries in his log book to "cover up his tracks." Roger refused to deliver the package, and he attempted to dissuade his father from sending it to Taylor. Unfortunately, he failed.

## B.

On January 11, 1996, two unidentified men shipped a package to Taylor from Sweetwater, Texas. Satellite tracking records obtained from Southern Refrigerated Transport, Gresham's employer, placed Gresham in Sweetwater on that afternoon, although his log book did not indicate a stop in Sweetwater. The return address on the shipping records identified the sender as Dana Meeks of Cedar Creek, Texas; Meeks had mailed a Christmas card to Taylor during the period when Taylor's mail had been diverted.

On January 12, U.P.S. delivered the package to Taylor. The package was a brown cardboard box attached to a Christmas card from Meeks and a photograph of the Meeks family. Taylor took the package into her home and opened it, whereupon it exploded. The ensuing investigation led authorities to Gresham.

## C.

Gresham was arrested and charged, in a four-count indictment,

5

with possession of an unregistered firearm, in violation of § 5861(d), and possession of a firearm by a convicted felon, in violation of § 922(g)(1). The government dismissed the other two counts. Gresham was convicted of both offenses.

## II.

Gresham argues that the district court erred in denying his motion to dismiss count one of the indictment, possession of an unregistered destructive device, because the statute is unconstitutional. Alleging that the statute exceeds the taxation power of Congress, Gresham claims that his conviction violates the due process clause. We disagree.

## A.

Gresham argues that § 5861(d) is unconstitutional because it exceeds the taxation power of Congress. The National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, requires the payment of a tax on the transfer or production of certain weapons. *See* 26 U.S.C. §§ 5811, 5821. In order to facilitate enforcement, the act requires all firearms to be registered with the National Firearms Registration and Transfer Record. *See* 26 U.S.C. § 5841. In order to guarantee compliance with the registration requirement, the statute criminalizes the possession of unregistered firearms. *See* § 5861(d).[1]

---

[1] For purposes of the NFA, the term "firearm" includes "destructive devices." *See* 26 U.S.C. § 5845(a). "Destructive devices," in turn, include any

(continued...)

Gresham charges that Congress has used the taxation power as a pretext to prohibit the possession of certain disfavored weapons, without any rational relationship to the revenue-raising purposes of the Internal Revenue Code. Therefore, Gresham claims that the NFA confers a police power on the United States, antithetical to the enumerated powers granted in the Constitution.

To the contrary, it is well-settled that § 5861(d) is constitutional because it is "part of the web of regulation aiding enforcement of the transfer tax provision in § 5811. Having required payment of a transfer tax and registration as an aid in collection of that tax, Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." *United States v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972).[2]

Insofar as the statute is a valid exercise of the taxing power, the fact that it incidentally accomplishes goals other than raising revenue does not undermine its constitutionality. "[T]he motives that move Congress to impose a tax are no concern of the courts." *Id*. at 1146. The facial constitutionality of 26 U.S.C. § 5861(d) is firmly established, and we need not reconsider it.

B.

Notwithstanding the statute's facial constitutionality,

---

(...continued)
"explosive bomb." *See* 26 U.S.C. § 5845(f). Under this definition, the pipe bomb manufactured by Gresham qualified as a "firearm" under the act.

[2] *See also United States v. Parker*, 960 F.2d 498, 500 (5th Cir. 1992) (discussing *Ross*).

7

Gresham claims that his conviction violates the due process clause and belies the constitutional foundation of § 5861(d), because it was legally impossible for him to register the pipe bomb and thus comply with the requirements of the NFA.  We disagree.

The NFA forbids the manufacture or transfer of any firearm without the government's advance permission.  Permission shall be denied if the making, transfer or possession of the firearm would place the transferee in violation of the law.  *See* 26 U.S.C. §§ 5812, 5822.  If permission is not obtained, the registration requirement cannot be satisfied.  *See* 26 U.S.C. § 5841(c). Consequently, Gresham complains that the NFA permits the government to deny registration, yet permits prosecution for possession of an unregistered firearm.  This dilemma, he contends, violates the due process clause and belies the constitutional foundation of the statute.

In support of this argument, Gresham cites two cases in which convictions obtained pursuant to § 5861(d) have been held unconstitutional, under circumstances similar to the instant case. *See*, *e.g.*, *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992); *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117 (C.D. Ill. 1991).  These two courts held that a conviction for possession of an unregistered machinegun, in violation of § 5861(d), would violate due process because the enactment of another statute, 18 U.S.C. § 922(*o*), made registration of the firearms impossible.[3]

---

[3] Section 922(*o*) outlaws the transfer or possession of all machineguns that were not lawfully possessed prior to the effective date of the statute.  Because
(continued...)

Likewise, they held that a statute enacted under the taxing power, to facilitate the enforcement and collection of the tax, loses its constitutional foundation when the object of the tax is prohibited. *See Dalton*, 960 F.2d at 125; *Rock Island Armory*, 773 F. Supp. at 125. Accordingly, the two courts concluded, it would violate due process to convict a defendant for violations of a statute when compliance with it is legally impossible.

This court rejected the same claim in *United States v. Ardoin*, 19 F.3d 177 (5th Cir. 1994), holding that the enactment of § 922(*o*) did not absolve machinegun owners of their obligation to register such weapons and pay the tax as required by the NFA, nor did it immunize them from criminal prosecution if they failed to comply with the statute. *Id*. at 180. Furthermore, we held that prosecutions under § 5861(d) are constitutional, despite the fact that it is legally impossible to register machineguns in the wake of § 922(*o*). *Id*. Hence, we held that such prosecutions do not offend due process.[4]

The *Ardoin* court based its conclusions on two fundamental

---

(...continued)
possession of machineguns manufactured or transferred after that date is illegal, their registration is legally impossible. *See* 26 U.S.C. § 5812, 5822.

[4] We declined to follow *Dalton* and *Rock Island Armory* in reaching our decision in *Ardoin*. *See Ardoin*, 19 F.3d at 179-80. Furthermore, the majority of courts addressing this question have agreed with our disposition, declining to follow *Dalton* and *Rock Island Armory*. *See United States v. Hunter*, 73 F.3d 260, 261-62 (9th Cir. 1996); *United States v. Rivera*, 58 F.3d 600, 601-02 (11th Cir. 1995); *United States v. Ross*, 9 F.3d 1182, 1192-94 (7th Cir. 1993), *vacated on other grounds*, 511 U.S. 1124 (1994); *United States v. Jones*, 976 F.2d 176, 182-84 (4th Cir. 1992).

premises that apply with equal force in the instant case.[5]  First, the court noted that Congress may tax illegal activity.[6] Consequently, although § 922(*o*) prohibits the transfer and possession of machineguns not legally possessed prior to 1986, Congress may still tax the illegal possession of such machineguns and may still assess criminal penalties for failure to comply with the registration requirements promulgated to enforce the tax.  *Id*. Insofar as the basis for the authority to regulate compliance with the registration requirements§§the taxing authority§§still exists, the *Ardoin* court held that the registration requirements are constitutional under the taxation power.  *Id*.

Likewise, even if Gresham was not legally entitled to possess a pipe bomb, the mere fact that his possession was illegal did not absolve him of the obligation to comply with the requirements of the NFA, nor did it preclude the government from prosecuting him for his failure to register the destructive device.  The pipe bomb remained taxable under the NFA; therefore, the registration requirements and enforcement provisions of the NFA are constitutional and enforceable.  *Cf. Ardoin*, 19 F.3d at 180.

Indeed, the facts of this case are even less sympathetic than

_____

[5] Gresham attempts to distinguish *Ardoin* by claiming that the only issue in *Ardoin* was whether the enactment of § 922(*o*) had implicitly repealed portions of the NFA.  This distinction is superficial and unpersuasive, however, as the theory of implicit repeal considered in *Ardoin* was based on the argument that the ban on machineguns rendered the registration requirements and criminal penalties of the NFA unconstitutional.  *Ardoin*, 19 F.3d at 179.  Therefore, *Ardoin* necessarily decided the constitutional issue as a prerequisite to rejecting the theory of implicit repeal.  *Id*.

[6] The authority of Congress to tax illegal activity is firmly established. *See*, *e.g.*, *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 778 (1994); *Marchetti v. United States*, 390 U.S. 39, 44 (1968).

10

are those we found insufficient to merit relief in *Ardoin*. There, registration of the machineguns was legally impossible, as the object of the tax had been banned completely by § 922(*o*). No federal statute completely outlaws the possession of pipe bombs, however; therefore, their registration is not legally impossible. *United States v. Gambill*, 912 F. Supp. 287, 290 (S.D. Ohio 1996); *accord United States v. Copus*, 93 F.3d 269, 276 (7th Cir. 1996).[7]

For this reason, the registration requirement governing pipe bombs is not a mere pretext for a police power, but is "part of the web of regulation aiding enforcement of the transfer tax provision in § 5811." *Ross*, 458 F.2d at 1146.[8] Under the circumstances of the instant case, therefore, the registration requirement is plainly constitutional.

Second, to the objection that it would violate due process to convict a defendant for the possession of an unregistered firearm, when such registration is impossible because the defendant cannot legally possess the firearm, the *Ardoin* court had a ready answer:

---

[7] *See also United States v. Thomas*, 15 F.3d 381, 382-83 (5th Cir. 1994) (affirming the denial of a motion for acquittal under § 5861(d) because defendant failed to demonstrate that pipe bombs cannot be registered).

[8] Gresham offers no authority to support the proposition that registration of a pipe bomb is legally impossible, but he contends that registration of a pipe bomb is impossible as a practical matter. However true that may be, it does not undermine the constitutional basis of the statute. To the contrary, if possession of pipe bombs is not illegal *per se*, the registration requirement is reasonably related to the revenue purposes of the act and does not impose an unreasonable dilemma on Gresham.

We express no opinion as to whether the prohibition against possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1), would have been sufficient to render the registration of the pipe bomb legally impossible in this case, as Gresham does not suggest this alternative ground for our consideration. *See United States v. Rivera*, 58 F.3d 600, 601-02 (11th Cir. 1995) (holding that the prohibition against possession of a firearm by a convicted felon does not render registration of such firearms "legally impossible").

11

Just say no.  If registration of the weapon is legally impossible, we explained, the defendant can comply with the registration requirement by not taking unlawful possession of an illegal weapon. Therefore, we held that prosecutions for failure to comply with the registration requirement do not violate the Due Process Clause, notwithstanding the fact that compliance may be legally impossible, because such prosecutions impose no "cruel dilemma" on defendants. *Ardoin*, 19 F.3d at 180 n.4.

Likewise, if it was legally impossible for Gresham to register the pipe bomb and thereby comply with the NFA, he could avoid prosecution by not engaging in the illegal activity.  If Gresham chose to build an illegal pipe bomb and violate the law, therefore, he cannot subsequently complain that his prosecution for a violation of § 5861(d) offends the Due Process Clause.  There is nothing "fundamentally unfair" about punishing a criminal, whether directly or indirectly, for engaging in illegal activity.  *Cf. Ardoin*, 19 F.3d at 180 n.4.[9]

III.

Gresham next argues that the district court erred in denying

---

[9] The mere fact that Gresham is exposed to prosecution for the same conduct under two different criminal statutes does not occasion a constitutional defect. The Constitution permits Congress to prohibit the same conduct under multiple statutes, provided the prosecution does not violate the Double Jeopardy Clause. *See*, *e.g.*, *Hunter*, 73 F.3d at 262; *Ross*, 9 F.3d at 1194; *Jones*, 976 F.2d at 183. In the instant case, Gresham's prosecution does not constitute double jeopardy. Accordingly, the government is entitled to prosecute him under both statutes, and the threat of prosecution under one statute does not immunize him from prosecution under another.

his motion to dismiss count two of the indictment, charging possession of a firearm by a convicted felon in violation of § 922(g)(1), because that statute is unconstitutional. Citing *United States v. Lopez*, 514 U.S. 549 (1995), Gresham claims the statute exceeds Congress's authority to regulate interstate commerce. Furthermore, he argues that the indictment charging him with violations of § 922(g)(1) was defective in that it failed to charge every element of the offense. Neither claim has merit.

## A.

The constitutionality of § 922(g)(1) is not open to question. In *United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996), we held that "neither the holding in *Lopez* nor the reasons given therefor constitutionally invalidate § 922(g)(1)." *Id*. at 242.[10] Accordingly, Gresham's constitutional challenge is foreclosed by circuit precedent.

## B.

Likewise, *Rawls* defeats Gresham's challenge to the indictment. Arguing that *Lopez* permits the United States to regulate intrastate activities only if they "substantially affect" interstate commerce, Gresham claims that the indictment was defective because it charged him with possessing a firearm "in or affecting interstate commerce," omitting the constitutional requirement of a

---

[10] *See also United States v. Dickey*, 102 F.3d 157, 163 (5th Cir. 1996) (reaffirming *Rawls*); *United States v. Kuban*, 94 F.3d 971, 973 (5th Cir. 1996) (reaffirming *Rawls*), *cert. denied*, 117 S. Ct. 716 (1997).

"substantial effect."  Therefore, Gresham concludes, the indictment did not charge every essential element of the offense, and must be dismissed.  Not so.

In *Rawls*, we recognized that the "in or affecting commerce" element of § 922(g)(1) may be satisfied if the firearm possessed by a convicted felon had traveled in interstate commerce.  *See Rawls*, 85 F.3d at 242-43.  Citing *Scarborough v. United States*, 431 U.S. 563 (1977), we further concluded that the statute requires only a "minimal nexus" between the firearm and interstate commerce.  *Id*. at 243-44 (Garwood, J., specially concurring).[11]  Consequently, the court held that the jurisdictional nexus was satisfied in *Rawls* because the firearm had traveled previously in interstate commerce. Likewise, in the instant case the government offered evidence to demonstrate that the firearm had traveled in interstate commerce, thereby satisfying the jurisdictional nexus.

Therefore, given that the "in or affecting commerce" element of § 922(g)(1) requires only a "minimal nexus" between the firearm and interstate commerce, the indictment in the instant case was not defective for omitting the "substantial effect" requirement endorsed in *Lopez*.  Gresham is entitled to no relief on this claim.

IV.

---

[11] The *Rawls* court acknowledged that this construction is at odds with the restrictive interpretation of the interstate commerce power endorsed in *Lopez*, but considered itself bound to follow the unambiguous language of *Scarborough*. 85 F.3d at 243 (Garwood, J., specially concurring).  The *Rawls* interpretation of the "in or affecting commerce" element of § 922(g)(1) is binding on this court. Therefore, the jurisdictional nexus provision of § 922(g)(1) requires only a "minimal nexus" between the firearm and interstate commerce.

14

Gresham avers that the evidence was insufficient to support his conviction for possession of a firearm by a convicted felon, under § 922(g)(1), because the evidence proved only that the component parts of the pipe bomb, rather than the bomb itself, had traveled in interstate commerce.  We disagree.

A.

In a sufficiency challenge, we examine the evidence in the light most favorable to the verdict and reverse only if no rational trier of fact could have found that the evidence established each element of the offense beyond a reasonable doubt.[12]  In order to obtain a conviction under § 922(g)(1), the government must prove three essential elements: (1) that the defendant previously had been convicted of a felony; (2) that he possessed a firearm; and (3) that the firearm traveled in or affected interstate commerce. *See United States v. Fields*, 72 F.3d 1200, 1211 (5th Cir.), *cert. denied*, 117 S. Ct. 48 (1996).  Gresham challenges only the third prong.

B.

Gresham claims that the evidence was insufficient to support his conviction because the evidence proved only that the component parts of the pipe bomb traveled in interstate commerce.  Indeed, the evidence demonstrates that Gresham assembled the bomb in Texas

_____

[12] *See*, *e.g.*, *United States v. Walters*, 87 F.3d 663, 667 (5th Cir.), *cert. denied*, 117 S. Ct. 498 (1996); *United States v. Dean*, 59 F.3d 1479, 1484 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 748 (1996), *and cert. denied*, 116 S. Ct. 794 (1996).

15

and shipped it by private carrier from one Texas city to another. Because the pipe bomb itself did not travel in interstate commerce, therefore, Gresham contends that the evidence was insufficient to support the conviction.  He is mistaken.

The statute provides that it shall be unlawful for a convicted felon to possess in or affecting commerce, *inter alia*, any firearm. *See* § 922(g)(1).  The term "firearm" is defined to mean, *inter alia*, "any destructive device."  *See* 18 U.S.C. § 921(a)(3).  The term "destructive device" is defined to include, *inter alia*, any "explosive bomb."  *See* 18 U.S.C. § 921(a)(4)(A)(I).  Likewise, the term "destructive device" also includes "any combination of parts either designed or intended for use in converting any device into any destructive device described in subparagraph (A) or (B) and from which a destructive device may be readily assembled."  *See* 18 U.S.C. § 921(a)(3)(C).  Under the plain language of the statute, therefore, the component parts of a destructive device constitute "firearms," for purposes of § 922(g)(1).

Although we have not previously addressed this precise issue, our holding that the jurisdictional nexus of § 922(g)(1) may be satisfied by proof that the component parts of the firearm traveled in interstate commerce, rather than the firearm itself, comports with the construction of this statute endorsed by two of our sister circuits.  *See United States v. Verna*, 113 F.3d 499, 502-03 (4th Cir. 1997); *United States v. Mosby*, 60 F.3d 454, 456-57 (8th Cir. 1995), *cert. denied*, 116 S. Ct. 938 (1996).  Accordingly, we join the majority of courts in holding that component parts are

16

"firearms" for purposes of § 922(g)(1).[13]

The government offered the testimony of two expert witnesses to establish that the component parts of the pipe bomb had been manufactured outside Texas and had necessarily traveled in interstate commerce before being assembled by Gresham.[14] Viewing this evidence in the light most favorable to the verdict, a reasonable jury could conclude that the component parts of the destructive device had traveled in interstate commerce. Therefore, because the component parts of a destructive device are "firearms," for purposes of § 922(g)(1), the evidence was sufficient to support Gresham's conviction under that section.

V.

Gresham argues that the district court erred in permitting the government to introduce hearsay testimony to demonstrate that the component parts of the bomb had traveled in interstate commerce. The government introduced the testimony of two expert witnesses,

---

[13] In a decision construing the predecessor to § 922(g)(1), the Second Circuit held that the jurisdictional nexus element of 18 U.S.C. § 1202(a) was not satisfied by proof that the process of manufacturing a firearm, including transactions in component parts, had traveled in or affected interstate commerce. *See United States v. Travisano*, 724 F.2d 341, 347-48 (2d Cir. 1983). *Travisano* is incompatible with the plain language of the statute, however, and has been criticized for taking "an unjustifiedly narrow view of the relevant commerce." *Mosby*, 60 F.3d at 456. Accordingly, we decline to follow *Travisano*, and we align ourselves with those courts that have enforced the plain language of the statute. *See Verna*, 113 F.3d at 502; *Mosby*, 60 F.3d at 456.

[14] These components included PyrodexSSan explosive powderSStwo batteries, and "end caps." The government experts testified that each of these products was manufactured outside Texas and had necessarily traveled in interstate commerce.

In particular, Pyrodex is "designed or intended for use" in explosives, and destructive devices may be "readily assembled" from such explosive powders. Therefore, the Pyrodex is sufficient to satisfy the jurisdictional nexus required by § 922(g)(1). *See Verna*, 113 F.3d at 502; *Mosby*, 60 F.3d at 457.

17

agents of the Bureau of Alcohol, Tobacco and Firearms ("ATF"), to satisfy the jurisdictional nexus element required by § 922(g)(1). It is firmly established in this circuit that such evidence is admissible to prove that a firearm was "in or affecting commerce" for purposes of § 922(g)(1).

## A.

We review the admission of evidence for abuse of discretion. *See United States v. Loney*, 959 F.2d 1332, 1340 (5th Cir. 1992). Our review, accordingly, is highly deferential.

## B.

Gresham claims that the district court abused its discretion by permitting the government to offer hearsay testimony in order to satisfy the jurisdictional nexus required by § 922(g)(1). We have consistently stated, however, that "[p]roof of the interstate nexus to the firearm may be based upon expert testimony by a law enforcement officer." *United States v. Privett*, 68 F.3d 101, 104 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 1862 (1996). Furthermore, it is axiomatic that expert opinions may be based on facts or data of a type reasonably relied upon by experts in a particular field, even if the sources are not admissible evidence. FED. R. EVID. 703. Consequently, the court did not abuse its discretion by permitting the expert witnesses to testify on the basis of hearsay.

The two ATF specialists testified that the component parts of

18

the pipe bomb had been manufactured outside Texas and had traveled in interstate commerce.  The agents, who were admitted as experts, based their testimony on discussions with the manufacturers, corporate literature and reference materials maintained by the ATF, studies of distinctive markings on the products, and their personal experience in law enforcement.  On the strength of this testimony, the jury necessarily found that the component parts had traveled in interstate commerce.

We have regularly upheld such expert testimony against hearsay challenges, holding that expert testimony is admissible to satisfy the jurisdictional nexus required by § 922(g)(1).[15]  In the instant case, the ATF experts relied on similar information.  Accordingly, the district court did not abuse its discretion in admitting the expert testimony to satisfy the jurisdictional nexus element.

VI.

Gresham contends that the district court abused its discretion in denying his motion for new trial, claiming that newly discovered evidence undermines the integrity of the jury verdict.  We disagree.

At trial, the government offered the testimony of Meeks, who stated that the return address on the envelope accompanying the pipe bomb had been written in her handwriting.  Meeks's testimony

---

[15] *See*, *e.g.*, *United States v. Wallace*, 889 F.2d 580, 584 (5th Cir. 1989) (distinctive markings and experience); *United States v. Merritt*, 882 F.2d 916, 920 (5th Cir. 1989) (manufacturer's markings on gun); *United States v. Harper*, 802 F.2d 115, 121 (5th Cir. 1986) (distinctive markings, trade publications, and company catalogues).

corroborated that of other government witnesses and supported the government's theory that Gresham had diverted the mail to obtain an innocuous return address for his deadly package. Immediately following the trial, Meeks recanted her testimony, stating that the return address was not written in her handwriting.

Gresham moved for a new trial, claiming newly discovered evidence. The district court denied the motion, however, finding that the challenged testimony was not material to the outcome of the trial. Gresham challenges this conclusion on appeal, insisting that the handwriting identification was intrinsic to the government's case. Given the overwhelming evidence marshaled against Gresham, however, his claim is without merit.


A.

We review the denial of a motion for new trial on the basis of newly discovered evidence exclusively for an abuse of discretion. *See*, *e.g.*, *United States v. Jaramillo*, 42 F.3d 920, 924 (5th Cir.), *cert. denied*, 115 S. Ct. 2014 (1995); *United States v. MMR Corp.*, 954 F.2d 1040, 1047 (5th Cir. 1992). Such motions are disfavored and are reviewed with great caution. *Jaramillo*, 42 F.3d at 924; *United States v. Pena*, 949 F.2d 751, 758 (5th Cir. 1991).

In order to merit a new trial on the basis of newly discovered evidence, the defendant must prove (1) that the evidence is newly discovered and was unknown to him at the time of trial; (2) that the failure to discover the evidence was not due to his lack of diligence; (3) that the evidence is not merely cumulative, but is

20

material; and (4) that the evidence would probably produce an acquittal. *Jaramillo*, 42 F.3d at 924; *Pena*, 949 F.2d at 758. Unless all four elements are satisfied, the motion for new trial must be denied. *Jaramillo*, 42 F.3d at 924; *Pena*, 949 F.2d at 758. Gresham cannot satisfy this strict burden of proof.

B.

The newly discovered evidence upon which Gresham relies is Meeks's recantation. We have often observed, however, that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts." *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir.), *cert. denied*, 117 S. Ct. 519 (1996).[16] The instant case is no exception. Hence, the district court did not abuse its discretion in ruling that the newly discovered evidence did not warrant a new trial.

Gresham claims that the first two requirements of the test for newly discovered evidence are necessarily satisfied in this case, because Meeks did not recant her testimony until after the trial. Although the evidence was unknown to Gresham at the time of trial, however, the government claims that Gresham did not exercise due diligence, because the defense did not cross-examine Meeks. Under similar circumstances, we have concluded that the failure to verify handwriting on an envelope, when the witness testified at trial concerning the handwriting, constituted a lack of diligence. *See*

---

[16] *Accord May v. Collins*, 955 F.2d 299, 314 (5th Cir. 1992); *United States v. Nixon*, 881 F.2d 1305, 1311 (5th Cir. 1989); *United States v. Adi*, 759 F.2d 404, 408 (5th Cir. 1985).

*United States v. Fowler*, 735 F.2d 823, 831 (5th Cir. 1984).

In her recanting statement to the district court, Meeks stated that she realized during her trial testimony that the handwriting on the envelope was not her own, but she testified falsely because the prosecutor expected her to verify the handwriting.[17]  Therefore, defense counsel could have exposed her indecision by effectively cross-examining the witness.  Having failed to examine the witness, the defense failed to exercise due diligence at trial.  Therefore, Gresham cannot claim that the subsequent recantation constitutes "newly discovered" evidence.  *See Fowler*, 735 F.2d at 831.

More importantly, Gresham cannot satisfy the materiality and prejudice requirements of the test for newly discovered evidence.  In order to merit a new trial, a defendant must demonstrate that newly discovered evidence would *probably* result in an acquittal.  *See MMR Corp.*, 954 F.2d at 1046; *Nixon*, 881 F.2d at 1311.  Gresham claims that Meeks's testimony was critical to the prosecution, providing a crucial link in the chain of circumstantial evidence linking him to the package delivered to Taylor.  We disagree.

The evidence incriminating Gresham was overwhelming.  First, the government offered the testimony of several witnesses with whom Gresham had discussed his intentions.  Gresham bragged that he had diverted Taylor's mail and stolen a Christmas card addressed to her, which he intended to use as an innocuous courier for his package.  Meeks verified that she had sent a Christmas card and

---

[17]  There is no question that the prosecutor acted in good faith and believed Meeks's trial testimony to be truthful; Meeks did not recant until after trial.

22

family photograph to Taylor, and Taylor testified that the Meeks Christmas card and family photograph were attached to the package. Finally, the package was shipped via U.P.S. from Sweetwater, and satellite records demonstrated that Gresham was in Sweetwater on the date the package was shipped. Under these circumstances, Meeks's recantation would not have altered the verdict; the evidence incriminating Gresham was too damning to overcome.

Whether the return address on the envelope was written by Dana Meeks is not material to the ultimate issue in this case: whether Gresham was guilty of shipping the pipe bomb to Taylor. Although Meeks's testimony corroborated the government's theory of the case, it was not necessary to obtain a conviction. Thus, the "newly discovered" evidence was cumulative, not material. Moreover, given the weight of the evidence amassed against Gresham, Meeks's recantation is not sufficient to raise a reasonable doubt. Under these circumstances, it is impossible to conclude that this "newly discovered evidence" would *probably* result in an acquittal. *See MMR Corp.*, 954 F.2d at 1046; *Nixon*, 881 F.2d at 1311.

AFFIRMED.