[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 22, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-12910

_____

D. C. Docket No. 07-80136-CR-DTKH

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

AARON SPOERKE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 22, 2009)

Before MARCUS and PRYOR, Circuit Judges, and EDENFIELD,[*] District Judge.

PRYOR, Circuit Judge:

_____

[*] Honorable B. Avant Edenfield, Senior United States District Judge for the
Southern District of Georgia, sitting by designation.

The main issue presented by this appeal is whether a homemade explosive device made of polyvinyl chloride (PVC) pipe, which the defendant described as a "pipe bomb" that could propel shrapnel and admitted was both illegal and dangerous, is a "destructive device" under the National Firearms Act. 26 U.S.C. §§ 5801 et seq. We conclude that it is. Aaron Spoerke was convicted of charges related to the making and possession of unregistered destructive devices after pipe bombs he made were discovered during a traffic stop and later search of the apartment where he lived. Spoerke was sentenced to 44 months of imprisonment and now challenges his convictions and sentence on numerous grounds, including the constitutionality of the Firearms Act, the validity of the traffic stop and search, and the reasonableness of his sentence, all of which are without merit. We affirm.

## I. BACKGROUND

At 2:22 a.m. on August 15, 2006, Officer Vincent Haugh of the police department of Boynton Beach, Florida, stopped a Nissan Sentra after observing an occupant throw a "wrapper or possibly a piece of paper" from a window on the driver's side of the vehicle. Officer Haugh approached the stopped vehicle with his gun drawn because it was late at night and he saw the occupants of the vehicle "reaching down[ and] reaching around." Officer Haugh identified himself to the driver, Raymond Kramer, and asked Kramer for identification. Because Kramer

2

did not have his driver's license, Officer Haugh asked him to exit the vehicle.

When Kramer opened the driver's door of the vehicle, Officer Haugh observed a pair of gloves, a flashlight, and a pair of goggles with an attached face mask, possibly a welding mask, on the floorboard. Officer Haugh frisked Kramer and found no weapons, but Officer Haugh found a cell phone wrapped in plastic. Officer Haugh then informed Kramer that he had been stopped for littering. Kramer denied throwing anything from the vehicle and suggested that one of the passengers had thrown the item.

Jonathan Geidel, the passenger riding in the backseat, stated that he had stuck his hand out of the window to wipe away condensation on the window, but Geidel denied having thrown anything from the vehicle. Officer Haugh asked Geidel to exit the car, frisked him, and found a pair of gloves, which Geidel stated that he used for work.

Officer Haugh then spoke to Spoerke, who was seated in the front passenger seat. When Spoerke admitted that he was carrying a pocket knife, Officer Haugh asked him to exit the car, frisked him, and found another knife, a pair of gloves, a flashlight, and a cell phone wrapped in plastic. As Spoerke exited the vehicle, Officer Haugh saw an open Taco Bell bag on the floorboard of the front passenger seat that contained two duct-taped balls with a green string attached, which he

3

suspected to be improvised explosive devices. Officer Haugh then asked the final passenger, Kyle Koehler, to exit the vehicle, frisked him, and found a pair of gloves and a waterproofed cell phone.

Because he suspected that the four men were involved in a burglary based on the gloves, masks, and tools present in the car and on their persons, Officer Haugh conducted an investigation into the potential burglary and the homemade explosive devices. Officer Haugh removed the devices from the vehicle, placed them on the roof of the vehicle, and asked the four men what the devices were. Spoerke stated that they were "pipe bombs" that they liked to "throw . . . in canals and watch . . . explode." Officer Haugh inquired about the materials used to make the bombs, and Spoerke replied that they were made with PVC. Officer Haugh then searched the remainder of the passenger compartment of the car and found a large knife under the back seat, a "paintball type mask," and a cigarette lighter. Officer Haugh asked Kramer for the keys so that he could search the trunk, and Kramer complied. Officer Haugh observed a number of tools inside the trunk that could have been used for burglaries and two four-foot-long pieces of PVC pipe.

After the search of the vehicle was complete, Sergeant Michael Kelly, Officer Haugh's supervisor, arrived on the scene and requested the assistance of the county bomb squad. Officer Haugh placed the bombs back in the vehicle,

4

closed the trunk and doors, and sealed off the area. Spoerke and the other occupants of the vehicle were placed in the back of a patrol car and detained for possession of bombs. Officer Haugh issued Kramer a written warning for littering. Special Agent Hugh O'Connor, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, arrived at the scene at approximately 4:30 a.m., and after the bomb squad photographed the devices, Agent O'Connor deactivated the devices and took custody of the pieces of the bombs and samples of the explosive powder inside the bombs.

Kramer admitted that they had constructed the bombs at his home and consented to a search of his car. The agents seized a receipt from "Gator Guns and Archery Center," a container of explosive powder, and the Taco Bell bag from the vehicle. Spoerke and the other detainees were transported to the Boynton Beach Police Department. Kramer and Geidel consented to a search of their shared residence. Agent O'Connor interviewed Spoerke after advising him of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

Spoerke and Kramer were indicted on charges related to the explosive devices: conspiracy to unlawfully make destructive devices, 18 U.S.C. § 371; 26 U.S.C. §§ 5822, 5845(a) & (f), 5861(f); unlawfully making one or more destructive device, 26 U.S.C. §§ 5822, 5845(a) & (f), 5861(f), 5871; 18 U.S.C. § 2; and

5

possessing unregistered destructive devices at two different locations, 26 U.S.C. §§ 5845(a) & (f), 5861(d), 5871; 18 U.S.C. § 2. Spoerke and Kramer filed several unsuccessful pretrial motions. Spoerke moved to suppress the physical evidence and the statements obtained during the stop. Spoerke also adopted Kramer's motion to dismiss the indictment on the ground that the National Firearms Act is unconstitutional facially and as applied. The district court adopted the report and recommendation of a magistrate judge and denied both motions.

After the district court severed Kramer's and Spoerke's cases, Kramer was placed in a pretrial diversion program, and Spoerke proceeded to trial. Officer Haugh testified at trial about the stop and the evidence obtained as a result of the searches of Spoerke and the vehicle. A recording of the traffic stop made by the video camera in Officer Haugh's patrol car was also introduced into evidence during Officer Haugh's testimony.

The government presented two witnesses who testified about the composition of Spoerke's devices. Detective Kenneth Udell, an officer with the bomb squad of the Sheriff's Office of Palm Beach County, testified that he had examined the two pipe bombs removed from the Nissan and that both bombs contained a black, explosive powder. Detective Udell also testified that he searched an apartment leased by Kramer and Geidel and seized a pipe bomb that

6

was identical to the bombs seized from the Nissan, a PVC pipe, a saw, shavings from a PVC pipe, PVC pipe cement, a container of black powder, fuses, and duct tape. Lloyd Erwin, a forensic chemist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, testified that he had examined the bomb debris from the deactivated pipe bombs. He described the bombs as encased in cylinders of PVC pipe, four inches in length, with an inside diameter of one inch, that contained black powder, which consisted of potassium nitrate and ascorbic acid, and was designed to explode in a confined space. He also testified that the fuses worked properly.

The government introduced evidence about the destructive nature of Spoerke's devices. Agent O'Connor, an explosives expert, testified that he constructed a pipe bomb similar to Spoerke's devices to test Spoerke's assertion that the bombs sank in water. Agent O'Connor testified that his bomb did not sink when placed in water; it floated. Agent O'Connor also constructed three identical bombs and detonated them at a weapons range: one bomb was detonated standing alone; another was strapped to a watermelon and detonated; and the third bomb was placed inside a locked, plastic tool box and detonated. The watermelon was destroyed, and the fragments of the tool box were propelled a distance of about 200 feet. The jury viewed videotape recordings of the explosions at three speeds: (1)

7

real-time speed; (2) a speed 10 times slower than normal; and (3) a speed 20 times slower than normal.

Walter Conklin, an explosives enforcement officer with the Bureau, testified, as an expert, that Spoerke's pipe bombs could not be legally manufactured or sold because they did not have an industrial, commercial, or social use. Conklin stated that Spoerke's bombs were "weapons" because fragments of the bomb could be projected in all directions and seriously injure people in the area. Conklin opined that Spoerke's pipe bombs were "destructive devices" under federal law and could not be fireworks because the bombs were designed to project fragments. According to Conklin, a device need not be lethal to be a destructive device.

Agent O'Connor also testified about his interview of Spoerke, during which Spoerke stated that he knew the devices were illegal under state and federal law and that he knew that if the bomb exploded on land it would be dangerous and could cause injury. According to Agent O'Connor, Spoerke first stated that he and Kramer made the pipe bombs, but later stated that he had constructed the bombs while Kramer "just watched." Spoerke stated that he and Kramer had detonated one pipe bomb underwater in a canal earlier in the day before the traffic stop. According to Spoerke, the pipe bombs made "a good concussion" and he detonated

8

them only for personal entertainment. Spoerke said that he did not detonate the bombs on land because he did not want to be near shrapnel and that he was not trying to hurt anyone and "just enjoyed seeing 'a flash underwater' and feeling a 'concussion.'" A recording of the interview and a transcript of the recording were admitted into evidence to corroborate Agent O'Connor's testimony. Agent O'Connor also testified that, after the interview, he determined that Spoerke had not applied to manufacture destructive devices and had not registered the bombs with the Bureau as provided by the National Firearms Act.

Spoerke did not testify in his own defense and presented one witness, David Keen, an expert on explosives and pyrotechnics. Keen testified that Spoerke's devices were not bombs because, in his opinion, they were not lethal. Keen testified that Spoerke's devices were not designed to produce a lethal blast or fragmentation and were like firecrackers, not weapons. Keen acknowledged that Spoerke's devices were not commercially or legally available and that commercially available fireworks could not be made with plastic pipe. Although Keen performed no tests of his own, he opined that a device like Spoerke's would send sharp plastic fragments only a few inches or feet through the air.

The jury convicted Spoerke on all charges, and the district court sentenced him to a term of 44 months of imprisonment and three years of supervised release

and ordered him to pay a special assessment. The presentence investigation report assigned a base offense level of 18, which was increased based on specific offense characteristics to an adjusted offense level of 22, and a criminal history category of I. The guidelines provided a sentencing range between 41 and 51 months of imprisonment. Spoerke objected to the report and guidelines range and argued that he was entitled to a reduction for acceptance of responsibility because he went to trial only to preserve the constitutional challenge and had not contested the factual basis of his indictment. The district court determined that Spoerke was not entitled to the reduction because he had contested a factual element of the case. Spoerke then argued for a sentence "somewhere between the pretrial diversion [Kramer] got and 50 months under the guidelines" to avoid unwarranted sentence disparities. The district court determined that a sentence below the guidelines was not warranted because a preponderance of the evidence established that Spoerke had been involved in burglaries in the past.

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal. When a motion to dismiss challenges the constitutionality of a statute, we review de novo the interpretation of the statute by the district court. United States v. Evans, 476 F.3d 1176, 1178 (11th Cir. 2007); United States v. Trainor, 376 F.3d 1325, 1330 (11th Cir. 2004). "The

10

inquiry into the sufficiency of the government's evidence produced at trial is a question of law subject to de novo review." United States v. Keller, 916 F.2d 628, 632 (11th Cir. 1990). "The court . . . views the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." Id. We will affirm the denial of a motion to acquit if "a reasonable factfinder could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." Id. We review the denial of a motion to suppress as a mixed question of law and fact; "rulings of law [are] reviewed de novo and findings of fact [are] reviewed for clear error, in the light most favorable to [the government,] the prevailing party in district court." United States v. Lindsey, 482 F.3d 1285, 1290 (11th Cir. 2007). Evidentiary rulings by the district court are reviewed for an abuse of discretion, United States v. Malol, 476 F.3d 1283, 1291 (11th Cir. 2007), and we will "not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous," United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (internal quotation marks omitted). "We review the denial of a motion for a new trial for abuse of discretion." United States v. Hernandez, 433 F.3d 1328, 1332 (11th Cir. 2005). "A challenge to a jury instruction presents a question of law subject to de novo review." United States v. Ndiaye, 434 F.3d 1270, 1280 (11th Cir. 2006). "[T]he district court has broad

11

discretion in formulating its charge as long as the charge accurately reflects the law and the facts." United States v. Chastain, 198 F.3d 1338, 1350 (11th Cir. 1999) (internal quotation marks omitted). An issue raised for the first time on appeal is reviewed for plain error. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005). "Plain error occurs where (1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings." United States v. Hall, 314 F.3d 565, 566 (11th Cir. 2002).

We review de novo the application of the Sentencing Guidelines, United States v. Campa, 529 F.3d 980, 992 (11th Cir. 2008), and review a criminal sentence for reasonableness, United States v. Booker, 543 U.S. 220, 261, 125 S. Ct. 738, 765–66 (2005). "The reasonableness of a final sentence is reviewed only for an abuse of discretion." United States v. Williams, 526 F.3d 1312, 1321 (11th Cir. 2008) (per curiam). "Review for reasonableness is deferential." United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005) (per curiam). "'The district court is in a unique position to evaluate whether a defendant has accepted responsibility for his acts, and this determination is entitled to great deference on review. Unless the court's determination is without foundation, it should not be overturned on

12

appeal.'" United States v. De La Rosa, 922 F.2d 675, 680 (11th Cir. 1991)

(quoting United States v. Campbell, 888 F.2d 76, 78 (11th Cir. 1989)).

## III. DISCUSSION

Our discussion is divided in four parts. First, we address Spoerke's

challenge to the constitutionality of the National Firearms Act. Next, we discuss

the sufficiency of the evidence to sustain the finding that Spoerke's devices were

destructive devices within the meaning of the Act. We then discuss Spoerke's

remaining challenges to his convictions. Finally, we address Spoerke's challenges

to his sentence.

### A. The National Firearms Act Is Constitutional.

Spoerke argues that the district court erred when it denied his motion to

dismiss his indictment because the National Firearms Act is unconstitutional.

Spoerke argues that the Act is both facially unconstitutional and unconstitutional as

applied to him. The district court rejected both arguments, and so do we.

The National Firearms Act is facially constitutional. The Act, 26 U.S.C. §§

5801 et seq., regulates firearms, including "destructive device[s]," id. § 5845(a)(8),

and requires the taxation and registration of firearms by manufacturers, possessors,

transferors, dealers, importers, and sellers. See United States v. Aiken, 974 F.2d

446, 447 (4th Cir. 1992). The Supreme Court has upheld the Act based on the

13

taxation power of Congress, Sonzinsky v. United States, 300 U.S. 506, 514, 57 S. Ct. 554, 556 (1937), and we have upheld the Act in a decision involving a "destructive device." United States v. Ross, 458 F.2d 1144, 1145 (5th Cir. 1972). "Congress under the taxing power may reasonably impose a penalty on possession of unregistered weapons." Id.; see also United States v. Gresham, 118 F.3d 258, 262 (5th Cir. 1997) ("[I]t is well-settled that [the Firearms Act] is constitutional because it is 'part of the web of regulation aiding enforcement of the transfer tax provision in [the Act].'" (quoting Ross, 118 F.2d at 1145)).

Spoerke's argument that the Act is unconstitutional as applied to him because pipe bombs are unlawful and cannot be taxed fails. "[T]he unlawfulness of an activity does not prevent its taxation." Dep't of Revenue of Mont. v. Kurth Ranch, 511 U.S. 767, 778, 114 S. Ct. 1937, 1945 (1994). "A statute does not cease to be a valid tax measure because it deters the activity taxed, because the revenue obtained is negligible, or because the activity is otherwise illegal." Minor v. United States, 396 U.S. 87, 98 n.13, 90 S. Ct. 284, 289 n.13 (1969). The constitutionality of the Act as applied to Spoerke does not depend on whether he is legally permitted to possess the pipe bombs. Gresham, 118 F.3d at 263.

Spoerke's argument is also based on a false premise: "No federal statute completely outlaws the possession of pipe bombs . . . ; therefore, their registration

14

is not legally impossible." Id.; United States v. Eaton, 260 F.3d 1232, 1236 (10th Cir. 2001) (prosecution for possession of unregistered pipe bombs under the Act was not unconstitutional because registration of a pipe bomb is not a legal impossibility). Because Spoerke conceivably could have registered and paid taxes on his pipe bombs, "the registration requirement governing pipe bombs . . . is part of the web of regulation aiding enforcement of the transfer tax provision in [the Act]" and is "plainly constitutional." Gresham, 118 F.3d at 263 (internal quotation marks omitted).

We also have rejected an argument by a defendant that his "firearms conviction violate[d] due process because it punishes him for possessing an unregistered firearm when registration to [the defendant], a convicted felon, is precluded by law." United States v. Rivera, 58 F.3d 600, 601 (11th Cir. 1995). We explained that, because the defendant could comply with the Act "by declining to possess firearms[,] . . . his conviction under [the Act] does not violate due process." Id. at 602. The same is true for Spoerke and his pipe bombs. Because Spoerke could have declined to manufacture and possess the pipe bombs, his indictment and conviction do not violate his right to due process.

B. *The Evidence Was Sufficient To Support the Finding That Spoerke's Devices Were Destructive Devices Under the Act.*

Spoerke argues that the district court erred when it denied his motion for a

15

judgment of acquittal because the evidence was insufficient to convict him. Spoerke challenges the sufficiency of the evidence as to one element that is common to each conviction: whether the pipe bombs were destructive devices within the meaning of the Act. A "destructive device" is defined as an explosive device that is "designed . . . for use as a weapon." 26 U.S.C. § 5845(f). Spoerke argues that the United States failed to prove that the devices were designed to be used as weapons.

In United States v. Hammond, we ruled that a cardboard explosive device was not a "destructive device" under the Act because the evidence did not establish that the device was designed as a weapon. 371 F.3d 776, 782 (11th Cir. 2004). The device was "a cardboard tube, approximately thirteen inches long and one-and-one half inches in diameter," filled with an explosive powder, with the ends "crimped and dipped in liquid candle wax[,]" three layers of tape wrapped around the tube, and a fuse attached to the device. Id. at 778. The government argued that "Hammond's device came within the statute's proscriptions because it was an explosive device," id. at 780, but we required additional evidence that the device was designed as a weapon:

> Although the statute does define a "destructive device" to include explosive devices, such as Hammond's, it also explicitly excludes from coverage any explosive device not designed for use as a weapon. Thus, a device that explodes is not covered by the statute merely

16

because it explodes. Statutory coverage depends upon proof that a device is an explosive plus proof that it was designed as a weapon. No explosive can constitute a destructive device within the meaning of the statute unless it has this "plus" factor.

Id. (citation omitted). Because "[t]he government . . . offered no proof of this required 'plus' factor[,]" the evidence was insufficient to prove that the device was a "destructive device" prohibited by the Act. Id. at 780, 782. An expert for the government testified that Hammond's device "was constructed as a 'weapon,' [but] he offered no insight as to how he arrived at this conclusion other than that the device would explode and cause damage." Id. at 780. This testimony was insufficient to prove that the device was designed to be used as a weapon. Id.

Spoerke argues that his pipe bombs were not designed as weapons under Hammond because "nothing [was] added to [the pipe bombs] to cause harm, such as tacks, nails, BBs or other small metal pieces which would serve as projectiles or other items contained in the PVC, such as radioactive material, poison gas, [or] deadly germs," but we disagree. Although the Hammond Court, in dicta, provided a non-exhaustive list of "examples of design features that would support a jury finding that an explosive device was designed as a weapon," id., we acknowledged that a device need not contain projectiles or fit into one of the categories described in Hammond to be a destructive device under the Act because "the critical inquiry is whether the device, as designed, has any value other than as a weapon." Id. at

17

781. "[T]he presence of design features that eliminate any claimed entertainment or other benign value supports a finding that the device was designed as a weapon." Id. Spoerke's devices may be "destructive device[s]," even if they contained no additional projectiles, because they have no social value.

Spoerke's admissions alone established that his pipe bombs were designed as weapons. During the traffic stop, Spoerke described the devices as "pipe bombs," and during his interview following his arrest, he described the fragments from the device as "shrapnel" and stated that they could hurt people nearby. See id. at 780 (mentioning a device that consisted of pipe that, when detonated, could propel fragments "like shrapnel against the bodies of those in the vicinity" as a weapon under the Act). Spoerke distinguished his pipe bombs made of PVC from devices, like the one in Hammond, made of cardboard, which he described as a "firecracker." See id.

The expert testimony introduced by the government also established that Spoerke's pipe bombs were designed as weapons. Agent Conklin testified that Spoerke's pipe bombs had no social or entertainment use, they propelled fragments, and the fragments were capable of causing severe injury to people in the vicinity. The government also introduced a video demonstration of similar pipe bombs decimating a watermelon, propelling shards of PVC pipe 30 feet, and

18

propelling shards of plastic 200 feet when the device was detonated inside a tool box. Although Spoerke attempted to undercut this evidence with expert testimony, Spoerke's expert did not conduct any independent tests. The jury was free to credit the testimony of the government's expert and discredit the testimony of Spoerke's expert. See United States v. Moore, 525 F.3d 1033, 1040 (11th Cir. 2008).

Spoerke asserts that the pipe bombs were intended for social enjoyment, he detonated them only underwater, and he enjoyed the concussion of the device when detonated. Our sister circuits are split over whether the court should consider the subjective intent of the defendant when determining whether the device was designed as a weapon. Compare United States v. Oba, 448 F.2d 892, 894 (9th Cir. 1971) (considering the defendant's subjective intent), with United States v. Posnjak, 457 F.2d 1110, 1118–20 (2d Cir. 1972) (applying an objective standard to determine whether the device falls within the reach of the Firearms Act), and United States v. Johnson, 152 F.3d 618, 628 (7th Cir. 1998) (adopting a mixed standard). Although the district court instructed the jury on the mixed standard, we decline to adopt a standard because the evidence of Spoerke's intent, under any standard, is sufficient to sustain his conviction.

The jury could have credited the testimony of Agent O'Connor and other evidence and discredited Spoerke's evidence that the device was made for social

19

enjoyment.  See Moore, 525 F.3d at 1040.  Spoerke's assertion that he designed the pipe bombs for fun and always exploded them underwater is contradicted by Agent O'Connor's testimony that the pipe bombs did not sink in water.  Although Spoerke alleges that he made the pipe bombs around only New Year's Eve and the Fourth of July, the evidence also established that Spoerke's pipe bombs were made in mid-August.  The testimony of Agent Conklin and the other evidence presented by the prosecution, if credited by the jury, were sufficient to establish that Spoerke's pipe bombs were designed as weapons and had no social value.  See also United States v. Dempsey, 957 F.2d 831, 834 (11th Cir. 1992) ("We again stress the indiscriminate and uniquely dangerous propensity of pipe bombs and grenades.").  The district court did not err when it denied Spoerke's motion for a judgment of acquittal.

C.  *Spoerke's Remaining Challenges to His Convictions Are Without Merit.*

Spoerke challenges his convictions on three remaining grounds: (1) that the district court should have suppressed physical evidence seized from Kramer's vehicle and statements made by Spoerke during the traffic stop; (2) that admission of evidence against Spoerke was an abuse of discretion; and (3) that the district court abused its discretion when it denied his motion for a new trial.  We discuss each argument in turn.

20

### 1. The District Court Did Not Err When It Refused To Suppress the Physical Evidence and Statements from the Traffic Stop.

Spoerke argues that the district court erred when it refused to suppress physical evidence obtained during the traffic stop, but we disagree. A traffic stop, which "is a seizure within the meaning of the Fourth Amendment," United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001), "is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio], 392 U.S. 1, 88 S. Ct. 1868 [(1968)]." United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam). Officer Haugh had probable cause, based on the littering violation, to stop the vehicle. United States v. Cooper, 133 F.3d 1394, 1398 (11th Cir. 1998) ("[L]aw enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles.") (internal quotation marks omitted); Fla. Stat. §§ 403.413(2)(a), (g), (4) (prohibiting littering). During a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety, Purcell, 236 F.3d at 1277, including requiring the driver and passengers to exit the vehicle "as a matter of course." Maryland v. Wilson, 519 U.S. 408, 410, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 110–12, 98 S. Ct. 330, 333–34 (1977).

21

Officer Haugh was permitted to extend the stop and search the vehicle based on an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring. United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting Purcell, 236 F.3d at 1277). Officer Haugh reasonably suspected that illegal activity had occurred or was occurring based on his observation of gloves, goggles, a face mask, and a flashlight in plain view on the floorboard of the vehicle. His suspicions were heightened by the fact that it was about 2:30 a.m., none of the occupants of the vehicle were carrying identification, all of the occupants had gloves, and Kramer, Koehler, and Spoerke were carrying waterproofed cell phones. Because Officer Haugh had an articulable suspicion that Spoerke and the other occupants of the vehicle could have been engaged in a burglary, he acted reasonably when he prolonged the traffic stop to investigate further.

Officer Haugh also had probable cause to seize the pipe bombs, which were in plain view on the floorboard of the vehicle, and search the vehicle for other contraband. Officer Haugh testified that he observed the bag and the bombs on the floorboard of the passenger seat when Spoerke exited the vehicle and Haugh recognized the items as improvised explosive devices. Spoerke argues that "the video of the traffic stop belies that assertion," because Officer Haugh "clearly

22

handled the items in the Taco Bell bag as if he was completely unaware they were explosives . . . ." This interpretation by Spoerke does not make the factual finding by the district court that Officer Haugh observed the devices and recognized them as explosives clearly erroneous. Because Officer Haugh observed the contraband in plain view, he was entitled to seize it. Purcell, 236 F.3d at 1277. The presence of the pipe bombs also provided probable cause that the vehicle contained additional contraband or other evidence of a crime and permitted Officer Haugh to conduct a warrantless search of the vehicle. United States v. Tamari, 454 F.3d 1259, 1261–62 (11th Cir. 2006).

Spoerke's argument that his statements to Officer Haugh during the traffic stop should have been suppressed based on a violation of his rights under Miranda, 384 U.S. 436, 86 S. Ct. 1602, fails because Spoerke's statements fall within the public safety exception. The "'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence," which the Supreme Court established in New York v. Quarles, 467 U.S. 649, 655, 104 S. Ct. 2626, 2631 (1984), "allows officers to question a suspect without first [providing Miranda warnings] when necessary to protect either themselves or the general public." United States v. Newsome, 475 F.3d 1221, 1224 (11th Cir. 2007) (per curiam). "The exception to Miranda also applies where

there is a threat to the officers rather than the public." Id. at 1225.  Officer

Haugh's questions were designed to discern the threat the bombs presented to the

officer and the nearby public.  The threat posed by two pipe bombs in a vehicle on

a city street "outweighs the need for the prophylactic rule protecting the Fifth

Amendment's privilege against self-incrimination."  Quarles, 467 U.S. at 657, 104

S. Ct. at 2632.

2.  The Evidentiary Rulings by the District Court Were Not an Abuse of Discretion.

Spoerke challenges two evidentiary rulings: (1) the admission of video

recordings of pipe bombs exploding; and (2) the admission of evidence of other

crimes discovered at Spoerke's arrest.  The challenges are without merit.  We

address each in turn.

Spoerke argues that the district court abused its discretion when it admitted

evidence of video recordings of pipe bombs exploding because "the devices in the

video did not accurately reflect the devices attributed to" Spoerke, "the

demonstration did not go to an essential element of the crime," and the prejudicial

nature of the recording outweighed its probative value.  We disagree.  "As a

general rule, the district court has wide discretion to admit evidence of experiments

conducted under substantially similar conditions."  Barnes v. Gen. Motors Corp.,

547 F.2d 275, 277 (5th Cir. 1977).  "Although the conditions of the demonstration

24

need not be identical to the event at issue, 'they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed.'" United States v. Gaskell, 985 F.2d 1056, 1060 (11th Cir. 1993) (quoting Barnes, 547 F.2d at 277). Demonstrative evidence is subject to Federal Rule of Evidence 403 and "should be excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Id. (quoting Fed. R. Evid. 403).

Spoerke asserts that "the devices in the video did not accurately reflect the devices attributed to" him, but he fails to support this bare allegation by explaining the differences between the devices in the demonstration and the devices he constructed and used. The district court was entitled to credit testimony by Agent O'Connor that the devices used in the video were constructed to be virtually identical in almost every aspect to Spoerke's devices. The parties did not stipulate to certain facts or issues, and the government had the burden to prove every element of Spoerke's crime at trial, including that the devices were "destructive devices" under the Firearms Act, 26 U.S.C. § 5845(a)(8), and that they were designed to be weapons, id. § 5845(f). See United States v. Laroche, 723 F.2d 1541, 1543 (11th Cir. 1984). The video demonstration was relevant to prove the nature of the devices Spoerke constructed and the characteristics of those devices,

25

which supported the charge that the devices were designed as weapons. See United States v. Jones, 124 F.3d 781, 787 (6th Cir. 1997) ("The videotaped explosion of the replica bomb served as evidence to establish that the bomb was a destructive device[, and] the district court did not abuse its discretion when it permitted the United States to show a videotaped explosion of the bomb."). Because Spoerke has failed to establish that the probative value of the demonstration was "substantially outweighed by the danger of unfair prejudice[ or] confusion of the issues," Fed. R. Evid. 403, the district court did not abuse its discretion when it admitted the demonstration video.

Spoerke also argues that the district court erroneously permitted the government to introduce "[e]vidence which implied other criminal activity," including references to the items seized from the vehicle, in violation of Federal Rules of Evidence 404(b) and 403. We disagree. Although Rule 404(b) prohibits the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," Rule 404(b) is a rule of inclusion that allows the admission of evidence of other crimes when that evidence is "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Evidence of other criminal activity "falls outside the scope of the

Rule, when it is '(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.'" United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007) (quoting United States v. Baker, 432 F.3d 1189, 1205 n.9 (11th Cir. 2005)).

The government was permitted to refer to the chain of events, including the search of the vehicle and arrest of Spoerke, that was an integral and natural part of the account of the crime, completed the story for the jury, and supported a finding that the devices found in the vehicle were designed as weapons. See id. at 1346. "[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when unfair prejudice substantially outweighs probative value that the rule permits exclusion." United States v. King, 713 F.2d 627, 631 (11th Cir. 1983). Spoerke has not established that the evidence caused him unfair prejudice sufficient to outweigh its probative value. The district court twice gave a limiting instruction that instructed the jury that the other items seized from the vehicle were admissible to prove only whether the pipe bombs were designed as weapons. Any possible unfair prejudice was cured by the limiting instruction. United States v. Chirinos, 112 F.3d 1089, 1098 (11th Cir. 1997).

### 3. The District Court Did Not Abuse Its Discretion When It Denied Spoerke's Motion for a New Trial.

Spoerke argues that the district court erred when it denied his motion for a new trial, and he cites a laundry list of alleged errors by the district court. The only issue about which Spoerke develops an argument that we have not already addressed is that the jury instructions were erroneous. That argument fails.

In the district court, Spoerke contested the jury instruction on the ground that it included ambiguous terms, but on appeal Spoerke argues that the instruction improperly shifted the burden of proof from the government to him. Because Spoerke first raises this issue on appeal, we review it for plain error. Rodriguez, 398 F.3d at 1298. "[T]he plain error test is difficult to meet," id. (internal quotation marks omitted), and no error, plain or otherwise, occurred here. The jury instruction was based on our decision in Hammond and accurately stated the law. The district court also instructed the jury several times that the government had the burden of proving each element of the crime beyond a reasonable doubt. The district court did not abuse its discretion when it denied Spoerke's motion for a new trial.

### D. Spoerke's Sentence Is Reasonable.

Spoerke challenges the calculation of his guidelines range and the reasonableness of his sentence. Both arguments fail, and we address each in turn.

## 1. The District Court Did Not Clearly Err When It Found that Spoerke Was Not Entitled to a Sentence Reduction for Acceptance of Responsibility.

Spoerke argues that he was entitled to a three-level reduction of his offense level based on his acceptance of responsibility because he challenged only the constitutionality of the Firearms Act, not the factual elements of the offense, but this argument fails. The Sentencing Guidelines provide a two-level reduction "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." United States Sentencing Guidelines § 3E1.1(a) (Nov. 2008). The reduction may be available, in a rare case, even when the defendant proceeds to trial:

> Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct).

Id. § 3E1.1 cmt. n.2. But where "a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse," he has not accepted responsibility and is not entitled to a reduction. Id. Spoerke was not entitled to this reduction because, in addition to his challenge to the constitutionality of the Firearms Act, he contested that the pipe bombs were destructive devices. See id.;

29

United States v. Brenson, 104 F.3d 1267, 1289 (11th Cir. 1997).  Spoerke also attempted to exclude evidence of his guilt.  See United States v. Gonzalez, 70 F.3d 1236, 1239–40 (11th Cir. 1995) (per curiam); U.S.S.G. § 3E1.1 cmt. n.2.

### 2.  Spoerke's Sentence Is Substantively Reasonable.

Spoerke argues that his sentence is substantively unreasonable because of unwarranted disparities between his sentence of 44 months of imprisonment and Kramer's enrollment in a pretrial diversion program, but we disagree.  When imposing a sentence, the district court is required "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), but Spoerke and Kramer are not similarly situated.  Kramer was never prosecuted or convicted of any conduct, he was not sentenced, and he is not similarly situated to Spoerke.  No unwarranted disparity exists.

Spoerke's sentence, which was in the middle of the guidelines range, is also reasonable.  "[T]here is a range of reasonable sentences from which the district court may choose, and when the district court imposes a sentence within the advisory Guidelines range, we ordinarily will expect that choice to be a reasonable one."  Talley, 431 F.3d at 788.  The district court did not abuse its discretion.

30

## IV.  CONCLUSION

Spoerke's convictions and sentence are **AFFIRMED.**