[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12489

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

PAUL STEPHEN VALDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:20-cr-00039-MCR-1

_____

Before LUCK, LAGOA, and ANDERSON, Circuit Judges.

PER CURIAM:

Paul Stephen Valdez appeals his conviction for theft of government property. He argues the district court abused its discretion by admitting rule 404(b) prior-bad-acts evidence because the evidence's probative value was substantially outweighed by undue prejudice. After careful review, we affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

In July 2020, Valdez was charged by superseding indictment with theft of government property valued at more than $1,000, in violation of 18 U.S.C. section 641. Valdez was accused of stealing eight ballistic plates—protective ceramic inserts that fit four to a body armor vest and are worth $625 each—from his military unit at Eglin Air Force Base. Valdez pleaded not guilty and opted for a trial.

As trial approached, the government notified Valdez of its intent to introduce evidence of three prior bad acts under Federal Rule of Evidence 404(b). The first was testimony that Valdez admitted to stealing a combat helmet a Special Forces soldier had placed on the ground during a training exercise. The second was evidence that Valdez stole smoke grenades. And the third was testimony about Valdez's professed plans to steal night-vision goggles and ammunition from his military unit.

Valdez moved to exclude evidence of the helmet, night-vision goggles, and ammunition under rule 404(b).  He argued there was insufficient evidence the helmet had been stolen and that any such evidence was relevant only to his character.  He also argued that any banter about stealing night-vision goggles and ammunition was simply part of the Army's joking culture, so admitting that evidence would be highly prejudicial but "only minimally probative."

The district court found the evidence admissible and so denied Valdez's motion.  It concluded that:  (1) the prior-bad-acts evidence was relevant to intent, knowledge, motive, opportunity, preparation, and planning; (2) Valdez's admission—even if "puffery"—was sufficient proof (for rule 404(b) purposes) that he stole the helmet; (3) whether Valdez was joking when he talked about plans to steal the goggles and ammunition went to the evidence's weight rather than its admissibility; and (4) any unfair prejudice—which was unlikely because the bad acts weren't heinous—could be mitigated by cautionary jury instructions.

At trial, the jury heard that, in 2019, Valdez was stationed at Camp Rudder at Eglin Air Force Base in Florida as part of the United States Army's 6th Ranger Training Battalion.  On the evening of August 27, Valdez was hanging out at the bar across the street from the barracks with Specialist Dylan Sitzler.  Around 10:00 p.m., Valdez asked Sitzler to go with him to a nearby building where his unit had staged equipment—including ballistic plates—for field training the next morning.

Sitzler testified that, while he acted as a lookout, Valdez—dressed in sweatpants and a black hoodie—climbed through the building's unlocked rear window and retrieved two ballistic plates. Valdez went back into the building twice and took six more plates, then used his hoodie to wipe away any fingerprints he might've left. Sitzler carried two of the plates back to his barracks room, but late that evening Valdez stopped by and asked him to keep two more. Sitzler took the plates but got nervous about keeping them, so he stashed all four in a tire in the motorcycle parking area.

The battalion didn't immediately recover the missing plates the next day, and Valdez called Sitzler to ask "where the plates were and if they were ready to be moved off site." Sitzler told Valdez he didn't know, then anonymously called the camp's staff duty desk to report the plates' location. The staff duty sergeant recovered the four plates from inside the tire.

Over the next few weeks, Valdez admitted to numerous members of his unit that he had taken the ballistic plates. On August 28—the day after the theft—he told Specialist Timothy Prater, but Prater thought Valdez was joking. About a week later, Valdez told Prater again, "with a more serious demeanor" this time. Around the same time, Valdez also told his eventual co-defendant, Specialist Timothy Johnson. According to Johnson, Valdez said he wanted to obtain a set of plates for his personal use before leaving active duty in December, so he didn't leave the Army "with nothing to show for it." Valdez confessed again in front of Johnson and Specialist Alejandro Perez following a training exercise a few weeks

later.  And on September 7, while at a bar in nearby Destin, Valdez told Sergeant Luke Harshaney.  Harshaney testified that he asked Valdez if he took the plates because, several months prior, Valdez had told Harshaney that he took a combat helmet from a Special Forces soldier training at Camp Rudder.  In response, Valdez first denied taking the plates, then tapped Harshaney's chest and asked if he was wearing a wire, and finally said yes, he took them by climbing through "a back window that people left cracked all the time."  Valdez told Harshaney that he planned to ship the plates home to Kentucky, just like he did with the helmet.  [*Id.* at 142:5–19]  Johnson testified that Valdez told him about the combat helmet too—Valdez said he found it "just sitting somewhere [unsecured] and [so] he grabbed it and took it."

A few weeks after the ballistic plates were stolen, Perez and Johnson helped Valdez move from the barracks to an apartment in Pensacola.  Perez testified that, during the move, Valdez showed him four ballistic plates and four or five smoke grenades in a closet in the apartment.  Perez recognized the plates and grenades as Army property.  Valdez told Perez that he and Harshaney took the grenades from the military unit.

On September 21, Valdez asked Perez for help moving the ballistic plates.  Perez said no, but he later agreed to lend his truck to Johnson.  Johnson used the truck to help Valdez—who, according to Johnson, thought investigators were onto him—move the plates from his apartment in Pensacola.  Valdez put the plates in Johnson's backpack along with at least one smoke grenade.

Johnson then stashed the backpack in the outdoor storage closet of his girlfriend Paige Powell's apartment in Crestview, Florida. Powell testified that she saw the plates and a smoke grenade in the backpack Johnson left in her storage closet.

Meanwhile, while Johnson had the truck, Perez followed his location on Snapchat: Valdez's Pensacola apartment and then, a bit later, Powell's Crestview apartment—which she shared with Perez's girlfriend. This made Perez suspicious that Valdez and Johnson had used his truck to move the ballistic plates to the women's apartment. So Perez eventually asked his girlfriend to allow officers to enter the apartment to seize the plates. She agreed, and on October 9, Perez notified Security Forces of where he suspected the plates could be found. Officers then went to the women's apartment and recovered the plates and smoke grenades.

In addition to evidence about the ballistic plates, combat helmet, and smoke grenades, the government presented evidence of two plans by Valdez to steal other military equipment. First, Johnson testified that, a few months before the plates went missing, Valdez discussed with him, Perez, Prater, and Specialist Zachary Outen a detailed plan for stealing night-vision goggles from the camp's staff duty desk: Valdez explained that someone could enter the building at 5:30 p.m.—when the desk would be unattended while the camp's flag was being lowered—to take the goggles from the desk's safe, and someone else could have a car waiting outside to go hide the goggles in the woods just off the camp's grounds, marking the spot using cell phone GPS for later retrieval. Prater,

too, recalled Valdez saying he "want[ed] to try to take some" night-vision goggles; Prater didn't know whether Valdez ever followed through, though.

Second, Johnson testified that Valdez talked with him and Outen about a plan—but not "like a real plan"—to steal ammunition. Outen testified that the men discussed, only hypothetically, "how easy it would be for anyone to get in" to the ammunition supply point, where "[s]ecurity . . . [wa]s minimal, at best." Outen said "[t]here was a little more thought put into" the conversation about stealing night-vision goggles, but even then the idea was dropped within a week. According to Security Forces Investigator Barton Gonzalez, no night-vision goggles were ever reported missing.

At the conclusion of the three-day trial, a jury convicted Valdez of theft of the ballistic plates. He was sentenced to five years of probation, including four months of home detention.

## STANDARD OF REVIEW

We, ordinarily, review a district court's admission of rule 404(b) prior-bad-acts evidence for a clear abuse of discretion. *United States v. Elysee*, 993 F.3d 1309, 1347 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 2782 (2022) (citation omitted). The government suggests, however, that Valdez is entitled only to plain error review because he didn't renew at trial his objections to the disputed evidence.

The government relies on *United States v. Brown*, 665 F.3d 1239 (11th Cir. 2011), but *Brown*, in turn, relies on a case applying a now-outdated version of the Federal Rules of Evidence. *See id.* at 1247 (citing *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir. 1990)). Rule 103 was amended in 2000 to add subsection (b): "Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid. 103(b) & advisory committee's note to 2000 amendment. A district court rules definitively when it uses "decisive" (as opposed to equivocal or contingent) language to deny or overrule a motion in limine. *See United States v. Wilson*, 788 F.3d 1298, 1313 (11th Cir. 2015). So Valdez did not need to renew at trial any objection the district court resolved definitively pretrial.

Valdez moved in limine to exclude evidence of the helmet, night-vision goggles, and ammunition, and the district court's order denying Valdez's motion was definitive. The district court concluded that the helmet-related evidence "satisfie[d] the [r]ule 404(b) standard for admissibility" and that evidence of Valdez's plans to steal night-vision goggles and ammunition was likewise "relevant and admissible under [r]ule 404(b)." Accordingly, Valdez did not need to renew his objections to this evidence at trial, and an abuse of discretion standard applies.

A plain error standard applies with respect to the smoke grenade evidence, though, because Valdez failed to preserve the issue by contemporaneous objection. *See United States v. Guevara*, 894

F.3d 1301, 1309 (11th Cir. 2018) (citation omitted).  Valdez's motion in limine didn't mention the smoke grenades, and he also failed to object at trial when witnesses testified about them—or when the district court admitted the grenades themselves, as well as photographs depicting them.

A district court abuses its discretion when it "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment." *United States v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005) (citations omitted).  Still, we will only reverse an erroneous evidentiary ruling if the resulting error was not harmless.  *United States v. Langford*, 647 F.3d 1309, 1323 (11th Cir. 2011) (citation omitted); *accord* Fed. R. Crim. P. 52(a).  "An error is harmless unless there is a reasonable likelihood that it affected the defendant's substantial rights."  *Langford*, 647 F.3d at 1323 (quoting *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999)).  Accordingly, we will not reverse "if sufficient evidence uninfected by any error supports the verdict, and the error did not have a substantial influence on the outcome of the case."  *Id.* (quoting (*United States v. Khanani*, 502 F.3d 1281, 1292 (11th Cir. 2007)).

"To demonstrate plain error, the defendant must show that there is '(1) error, (2) that is plain and (3) that affects substantial rights.'"  *Guevara*, 894 F.3d at 1309 (quoting *United States v. Turner*, 474 F.3d 1265, 1276 (11th Cir. 2007)); *accord* Fed. R. Crim. P. 52(b).  For an error to affect substantial rights, "the error must have been prejudicial:  It must have affected the outcome of the

district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993) (citations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Guevara*, 894 F.3d at 1309 (quoting *Turner*, 474 F.3d at 1276).

## DISCUSSION

Although two different standards of review apply here, we discuss the challenged evidence together because we conclude that, even under the more Valdez-friendly abuse-of-discretion standard, the district court did not abuse its discretion in admitting the rule 404(b) evidence.

Rule 404(b) prohibits the use of extrinsic "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" but permits such evidence for any other purpose, including "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(1)–(2); *United States v. Edouard*, 485 F.3d 1324, 1344 (11th Cir. 2007) (citation omitted). We apply a three-part test to analyze the admissibility of bad-acts evidence under rule 404(b): "(1) it must be relevant to an issue other than [the] defendant's character; (2) there must be sufficient proof to enable a jury to find by a preponderance of the evidence that the defendant committed the act(s) in question; and (3) the probative value of the

evidence cannot be substantially outweighed by undue prejudice, and the evidence must satisfy [r]ule 403." *Edouard*, 485 F.3d at 1344 (citation omitted). On appeal, Valdez disputes only the third prong of this test, arguing that the extrinsic evidence at issue "had little probative value to the charged offenses, while unduly prejudicing the jury against" him.

### Probative value

We assess prior-bad-acts evidence's probative value by "evaluat[ing] the [g]overnment's incremental need for the evidence to prove guilt beyond a reasonable doubt, 'the overall similarity of the extrinsic and the charged offenses[,] and the closeness or remoteness in time of the charged to the extrinsic offense.'" *United States v. Ellisor*, 522 F.3d 1255, 1268 (11th Cir. 2008) (quoting *United States v. Parr*, 716 F.2d 796, 805 (11th Cir. 1983)). "[I]f the government can do without such evidence, fairness dictates that it should; but if the evidence is essential to obtain a conviction, it may come in." *United States v. Calderon*, 127 F.3d 1314, 1332 (11th Cir. 1997) (quoting *United States v. Pollock*, 926 F.2d 1044, 1048 (11th Cir. 1991)).

Importantly, a defendant who pleads not guilty "makes intent a material issue which imposes a substantial burden on the government to prove intent . . . absent affirmative steps by the defendant to remove intent as an issue." *Edouard*, 485 F.3d at 1345 (quoting *United States v. Zapata*, 139 F.3d 1355, 1358 (11th Cir. 1998)). And, "[b]ecause it is difficult to prove intent by direct evidence, it normally must be inferred from circumstantial evidence."

*United States v. Hurley*, 755 F.2d 788, 790 (11th Cir. 1985) (citation omitted). So, "[a] similarity between the other act and a charged offense will make the other offense highly probative with regard to a defendant's intent in the charged offense." *United States v. Ramirez*, 426 F.3d 1344, 1354 (11th Cir. 2005) (citation omitted); *accord United States v. Baker*, 432 F.3d 1189, 1205 (11th Cir. 2005) ("[W]e have generally held that if the extrinsic act requires the same intent as the charged offenses[,] *and if* these acts are proximate in time to the charged offenses, then the extrinsic act is highly probative." (cleaned up)).

Here, the government had to prove beyond a reasonable doubt that Valdez knowingly and willfully intended to deprive the United States of the use or benefit of the ballistic plates. *See Morissette v. United States*, 342 U.S. 246, 263 (1952); *United States v. McRee*, 7 F.3d 976, 980 (11th Cir. 1993); Eleventh Circuit Pattern Jury Instructions (Criminal Cases) § O21 (2022). And Valdez pleaded not guilty, thereby making his intent a material issue which he did not affirmatively remove before or at trial. *See Edouard*, 485 F.3d at 1345.

Evidence that Valdez knowingly and willfully deprived—or planned to deprive—the United States of other military equipment was highly probative of his intent with regard to the ballistic plates. The combat helmet, smoke grenade, night-vision goggles, and ammunition evidence was very similar to Valdez's charged offense. All involved the actual or planned theft of high-value military equipment. Valdez removed both the smoke grenades and four of

the ballistic plates from Camp Rudder. The government intro-duced Valdez's admissions (to Harshaney) that he did the same with the combat helmet—shipping it home to Kentucky—and that he planned to ship the plates back home too. As for the night-vision goggles, Valdez planned in detail how to get the equipment off-camp undetected, then mark its hiding spot for later retrieval. That same plan leveraged a vulnerability he'd spotted—the daily period when the duty desk was unmanned while the camp's flag was low-ered—just like he leveraged his knowledge of "a back window that people left cracked all the time" to steal the ballistic plates. And Valdez's plan to steal ammunition likewise leveraged a known vul-nerability: lax security at the ammunition supply point.

The prior bad acts were also close in time to the charged offense. The smoke grenades were found with the ballistic plates. Harshaney estimated that Valdez told him he took the combat hel-met several months before the ballistic plates went missing. And although trial testimony didn't pin down when the conversations about Valdez's plans to steal night-vision goggles and ammunition occurred, Outen recalled Johnson and Prater being present for both. Johnson and Prater were assigned to Camp Rudder in No-vember 2018 and February 2019, respectively, meaning the conver-sations couldn't have happened more than six months before the ballistic plates were stolen—well within time periods we've found sufficiently proximate for rule 404(b) purposes. *See, e.g., Edouard*, 485 F.3d at 1345–46 (finding two years' distance sufficient); *United*

*States v. Diaz-Lizaraza*, 981 F.2d 1216, 1225 (11th Cir. 1993) (same); *Ellisor*, 522 F.3d at 1268 (three years).

In short, the strong similarities between the prior bad acts and Valdez's charged offense—coupled with the events' temporal proximity—add up to evidence "highly probative" of Valdez's intent to steal the ballistic plates. *See Ramirez*, 426 F.3d at 1354. Valdez argues the evidence wasn't essential to the government's case at trial and so was nonetheless insufficiently probative to satisfy rule 404(b), citing the numerous witnesses who saw Valdez take the plates, heard him admit to doing so, saw the plates in his possession, or helped him move the plates to where they were eventually found.

But the government's witnesses weren't impervious to impeachment. *Cf. Calderon*, 127 F.3d at 1332. Indeed, during his opening statement, Valdez urged the jury to critically assess the witnesses' credibility—particularly given the lack of DNA evidence physically tying Valdez to the ballistic plates. Valdez hammered at the witnesses' credibility on cross-examination too, challenging the accuracy of their memories and raising (particularly as to Sitzler and Johnson) their prior inconsistent statements and self-interest. And Valdez reinforced these credibility issues during his closing argument, reminding the jury how key witnesses' stories changed (sometimes repeatedly) and how self-interest may have led witnesses to minimize their own involvement in the charged offenses.

At bottom, the government needed to prove that Valdez intended to deprive the United States of the ballistic plates, and

essentially all its evidence of intent came from witness testimony. But "[t]he jury was entitled to believe as much or as little of the witnesses' testimony as it found credible." *United States v. Matthews*, 431 F.3d 1296, 1312 (11th Cir. 2005). In light of Valdez's substantial efforts to impugn the government witnesses' credibility at trial, we conclude that the rule 404(b) evidence was sufficiently probative of Valdez's intent to be admissible. *Cf. United States v. Beechum*, 582 F.2d 898, 917 (5th Cir. 1978) (en banc) ("Absent the credit card evidence, the issue would have been decided wholly by the jury's assessment of the credibility of these witnesses. The Government, therefore, did not make out such a strong case of criminal intent that the credit card evidence would have been of little incremental probity. In fact, the credit card evidence may have been determinative.").

### Undue prejudice

To be admissible under rule 404(b), of course, the prior-bad-acts evidence's probative value "cannot be substantially outweighed by undue prejudice, and the evidence must satisfy [r]ule 403." *Edouard*, 485 F.3d at 1344 (citation omitted). Because "rule 403 is an extraordinary remedy, which should be used only sparingly"—with the balance "struck in favor of admissibility"—we "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.* at 1344 n.8 (cleaned up). "[T]he test under rule 403 is whether the other acts evidence was dragged in by the heels solely for prejudicial impact." *Wilson*, 788 F.3d at 1314 (quoting

*United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1211 (11th Cir. 2009)).  "[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when *unfair* prejudice *substantially* outweighs probative value that [rule 403] permits exclusion." *United States v. Spoerke*, 568 F.3d 1236, 1251 (11th Cir. 2009) (quoting *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983)).  Moreover, "[a] limiting instruction can diminish any unfair prejudice caused by the evidence's admission." *Brown*, 665 F.3d at 1247 (citation omitted).

Here, Valdez argues that the rule 404(b) evidence was "highly[] and unduly prejudicial," contending that "the government encouraged the jury to draw [an] inference of criminal propensity" and so "most likely the jury was enticed to draw the prohibited inference."  But Valdez mischaracterizes the government's closing argument.  The government told the jury it could use the prior-bad-acts evidence "in deciding whether he had the intent, the motive, the opportunity to commit the theft"—precisely the sort of non-propensity uses that rule 404(b) permits.  More importantly, the rule 404(b) evidence was no more heinous or inflammatory than evidence related to theft of the ballistic plates themselves, and so the extrinsic evidence was unlikely to "incite the jury to an irrational decision." *See United States v. Mitchell*, 666 F.2d 1385, 1390 (11th Cir. 1982).  Instead, to the extent the evidence was prejudicial, it was—like any relevant evidence—*duly* prejudicial because of the government's need to prove intent. *See Spoerke*, 568 F.3d at 1251.  At worst, then, the evidence's unfair prejudice only matched its

probative value, rather than being "dragged in by the heels" for a purely prejudicial purpose. *Wilson*, 788 F.3d at 1314.

Finally, the district court gave numerous limiting instructions, both when the evidence was admitted and at the close of trial. These instructions—which cautioned the jury that it could (but wasn't required to) consider the bad-acts evidence in determining whether Valdez committed the charged offense "willfully, that is with bad purpose either to disobey or disregard the law, and knowingly, not because of an accident or mistake"—mitigated any undue prejudice caused by the evidence. *Cf. United States v. Sterling*, 738 F.3d 228, 237 (11th Cir. 2013) ("[W]e assume that the jury properly followed the court's instructions."). Because rule 404(b) excludes evidence only when its probative value is substantially outweighed by undue prejudice, we conclude that the district court did not err by admitting the challenged evidence here.

**AFFIRMED.**